**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 20, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITES STATES COURT OF APPEALS

TENTH CIRCUIT

---

MARK JORDAN,

      Plaintiff-Appellant,

v.

MARY H. SOSA, ADX Florence
Acting Inmate Systems Manager;
ROBERT A. HOOD, ADX Florence
Warden; (FIRST NAME UNKNOWN)
TUCKER, FCI Englewood Inmates
Systems Officer; ANGELA SHENK,
FCI Englewood Inmate Systems
Manager; J. L. NORWOOD, USP
Victorville Warden, in their individual
and official capacities; W. A.
SHERROD, FCI Englewood Warden,
in his official capacity,

      Defendants-Appellees.

No. 08-1326

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:05-CV-01283-EWN-KLM)**

---

Michelle M. Berge, Reilly Pozner LLP, Denver, Colorado, for Plaintiff-Appellant.

Michael C. Johnson, Assistant United States Attorney (David M. Gaouette, Acting
United States Attorney, with him on the brief), Denver, Colorado, for Defendants-
Appellants.

---

Before **BRISCOE**, Chief Judge, **TYMKOVICH** and **HOLMES**, Circuit Judges.

_____

**HOLMES**, Circuit Judge.

_____

Plaintiff-Appellant Mark Jordan was incarcerated in solitary confinement at the administrative maximum security facility in Florence, Colorado ("ADX"), when he commenced this action. Mr. Jordan was convicted of stabbing a fellow inmate while incarcerated in federal prison for several offenses, including three armed bank robberies. He brought a civil-rights action for a declaratory judgment and injunctive relief against specifically named officials of the Federal Bureau of Prisons ("BOP"), pursuant to 28 U.S.C. § 1331, to challenge the constitutionality of a statutory and regulatory ban on the use of federal funds to distribute to federal prisoners commercially published materials that are sexually explicit or feature nudity. Following a two-day bench trial, the district court held that the ban did not violate the First or Fifth Amendments to the United States Constitution. Mr. Jordan now appeals the district court's rejection of his First Amendment claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we conclude that Mr. Jordan's subsequent transfer to other prison facilities has rendered his claims moot.

## BACKGROUND

The BOP has regulated the distribution of sexually explicit publications to federal prisoners for over thirty years. In 1979, the BOP promulgated a

regulation granting wardens the discretion to reject incoming publications.[1]
Control, Custody, Care, Treatment, and Instruction of Inmates, 44 Fed. Reg.
38,254, 38,260 (June 29, 1979) (codified at 28 C.F.R. § 540.71(b)).  As codified,
this regulation authorizes wardens to reject "sexually explicit material which by
its nature or content poses a threat to the security, good order, or discipline of the
institution, or facilitates criminal activity."[2]  28 C.F.R. § 540.71(b)(7).  Although
this regulation vests wardens with considerable discretion to reject publications, it
forbids them from rejecting a publication "solely because its content is religious,
philosophical, political, social or sexual, or because its content is unpopular or
repugnant."  *Id.* § 540.71(b).  Wardens also may not "establish an excluded list of
publications," meaning that they must review materials on an issue-by-issue basis.
*Id.* § 540.71(c).  The Supreme Court upheld the facial constitutionality of this
regulation in *Thornburgh v. Abbott*, 490 U.S. 401, 419 (1989).

In 1996, Congress altered the regulatory landscape with the enactment of
the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110

---

[1]     The BOP promulgated this regulation pursuant to 18 U.S.C.
§ 1791(a)(2) and (d)(1)(G), among other statutory authorities.  Under
§ 1791(d)(1)(G), a federal prisoner is prohibited from obtaining "any . . . object
that threatens the order, discipline, or security of a prison, or the life, health, or
safety of an individual."

[2]     In general, this regulation allows wardens to "reject a publication
only if it is determined detrimental to the security, good order, or discipline of the
institution or if it might facilitate criminal activity."  28 C.F.R. § 540.71(b).
Although the regulation provides criteria for potentially banned publications, such
as "sexually explicit material," the specified criteria are not exhaustive.  *Id.*

-3-

Stat. 3009 (1996) ("Act"). In Section 614 of the Act, known as the Ensign

Amendment, Congress exercised its power of the purse to ratchet up the

restrictions on incoming publications at federal prisons. *See* § 614, 110 Stat. at

3009-66. The Ensign Amendment, which is codified at 28 U.S.C. § 530C(b)(6),

now provides that "no [BOP] funds may be used to distribute or make available to

a prisoner any commercially published information or material that is sexually

explicit or features nudity."[3] 28 U.S.C. § 530C(b)(6)(D).

In response to the Ensign Amendment, the BOP promulgated an

implementing regulation that narrows the scope of the statute by defining key

statutory terms.[4] *See* 28 C.F.R. § 540.72. Under this regulation, "nudity" means

---

[3]      The Ensign Amendment applies only to commercial publications. Nevertheless, the BOP interprets its statutory authority as permitting it to grant wardens the discretion to reject non-commercial materials that contain sexually explicit information or feature nudity. Incoming Publications: Nudity and Sexually Explicit Material or Information, 67 Fed. Reg. 77,425, 77,426 (Dec. 18, 2002) (stating that wardens regulate such materials under the general restriction in 28 C.F.R. § 540.12(a), which allows wardens to "establish and exercise controls to protect individuals, and the security, discipline, and good order of the institution"). The BOP claims that 28 C.F.R. § 540.12(a) "encompasses [its] discretion to reject photographs featuring nudity and explicit sexuality from non-commercial sources, such as an inmate's wife or girlfriend" because "[s]uch personal photographs typically cause disciplinary problems among inmates and compromise institution security and good order." *Id.*

[4]      The BOP continues to enforce the prior regulation, 28 C.F.R. § 540.71(b)(7), against incoming publications that pose a threat to "the security, good order, or discipline of the institution, or [that might] facilitate[] criminal activity," but that fall outside of the scope of 28 C.F.R. § 540.72. Aplt. App., Vol. III, at 662–66 (BOP Program Statement 5266.10, dated Jan. 10, 2003); *see Ramirez v. Pugh*, 379 F.3d 122, 125 n.1 (3d Cir. 2004).

"a pictorial depiction where genitalia or female breasts are exposed."

*Id.* § 540.72(b)(2). "Features" means that "the publication contains depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues." *Id.* § 540.72(b)(3). The definition of "features" carves out an exclusion, which is not present in the Ensign Amendment, for "publications containing nudity illustrative of medical, educational, or anthropological content." *Id.* "Sexually explicit" means "a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation." *Id.* § 540.72(b)(4). Although the Ensign Amendment covers all material that is sexually explicit or features nudity, whether pictorial or text, this regulation narrowly interprets the Ensign Amendment to prohibit only pictorial depictions. *See id.*

The BOP has also adopted a program statement to establish procedures for federal prisons to effectuate the Ensign Amendment and its implementing regulation. *See* Aplt. App., Vol. III, at 661–69 (BOP Program Statement 5266.10, dated Jan. 10, 2003). In Program Statement 5266.10, which was in effect at all times relevant to this action, Section 7 elaborates on the restrictions in the Ensign Amendment and in 28 C.F.R. § 540.72.[5] For example, the BOP explains that it

---

[5] Program Statement 5266.10 references a pre-codification version of the Ensign Amendment. For purposes of this analysis, however, the pre-codification version is substantially similar to the codified version.

may distribute certain periodicals to prisoners—such as National Geographic, sports-magazine swimsuit issues, or lingerie catalogues—because they contain nudity without featuring nudity. The BOP also indicates that written text "does not qualify a publication as sexually explicit." Aplt. App., Vol. III, at 669. Furthermore, the BOP notes that publications may be banned under 28 C.F.R. § 540.71 and Program Statement 5266.10 § 6(b)(7) even if they are not sexually explicit and do not feature nudity. *Id.*

BOP officials relied on § 540.72(b) and the program statement to reject four commercial publications addressed to Mr. Jordan. First, on February 26, 2003, BOP officials rejected a book entitled *Divas and Lovers – The Erotic Art of Studio Manassé*, which is a study of portraits from "a golden age of cinema and cabaret in Vienna of the 1920s and 1930s," Aplt. App., Vol. III, at 471, because every page is sexually explicit or features nudity. Second, on April 15, 2004, BOP officials rejected the May/June 2004 issue of *JUXTAPOZ Art & Culture Magazine* because eleven pages contain images from an art show in Detroit that are sexually explicit or feature nudity. Third, on May 21, 2004, BOP officials rejected the July/August 2004 issue of *JUXTAPOZ Art & Culture Magazine* because one page contains a re-print of an oil painting of a nude woman. Fourth, on August 15, 2004, BOP officials rejected a book entitled *Kama Sutra* because

depictions in the book are sexually explicit and feature nudity.[6] Mr. Jordan

exhausted his administrative remedies in appealing the rejection of these

publications.

On July 12, 2005, Mr. Jordan commenced this civil-rights action in the

United States District Court for the District of Colorado against the Warden and

the Inmate System Manager of the ADX, along with certain other BOP officials

assigned to penal institutions in Colorado and California in their individual and

official capacities.[7] Significantly, however, Mr. Jordan did not name as

defendants either the Director of the BOP or the BOP itself. By way of relief,

Mr. Jordan sought a declaratory judgment, an injunction, and damages, claiming

that (1) the Ensign Amendment violated the First Amendment, facially and as

applied to him; (2) the Ensign Amendment violated the Fifth Amendment; and (3)

the implementing regulation, 28 C.F.R. § 540.72(a), violated the First

Amendment, facially and as applied to him.[8] In a pre-trial order, the district court

---

[6] The record casts doubt on whether this was the classic ancient Sanskrit treatise or instead, as Mr. Jordan puts it, "a more recent photographic version of someone's interpretation of the *Kama Sutra*." Aplt. Opening Br. at 9.

[7] Specifically, Mr. Jordan identified the following people as defendants: Mary H. Sosa, ADX Florence Acting Inmate Systems Manager; Robert A. Hood, ADX Florence Warden; (First Name Unknown) Tucker, FCI Englewood Inmate Systems Manager; J.L. Norwood, USP Victorville Warden; and W.A. Sherrod, FCI Englewood Warden.

[8] In his Complaint, Mr. Jordan neglected to specifically challenge the implementing regulation, as applied to the individual publications. Because Mr.
(continued...)

-7-

dismissed Mr. Jordan's claims against the officials in their individual capacities along with his request for damages.

A bench trial was held on July 7 and 8, 2008. On July 11, 2008, the district court issued Findings of Fact and Conclusions of Law, upholding the constitutionality of the Ensign Amendment and its implementing regulation under the First and Fifth Amendments.[9] Mr. Jordan now appeals the district court's order with respect to the First Amendment.

## DISCUSSION

Mr. Jordan challenges the constitutionality of the Ensign Amendment and its implementing regulation. As an initial matter, we hold that Mr. Jordan has standing to challenge the Ensign Amendment only to the extent that it is embodied in the narrowly drafted implementing regulation. Additionally, because

---

[8](...continued)
Jordan proceeded pro se before the district court, we liberally construe his complaint to raise those arguments. *See Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (noting that we hold pro se filings "to less stringent standards than formal pleadings drafted by lawyers"); *Van Deelen v. Johnson*, 497 F.3d 1151, 1153 n.1 (10th Cir. 2007). We do not, however, assume the role of advocate for him. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

[9]     Mr. Jordan's Complaint also failed to challenge the program statement. Nevertheless, the district court struck down the portion of the program statement that allows the warden to return the rejected publication to the publisher prior to the completion of administrative review. The district court held that this portion of the program statement "deprive[s] [Mr. Jordan] of meaningful administrative review and therefore does not meet the requirements of due process" under the Fifth Amendment. Aplt. App., Vol. I, at 179 (Findings of Fact & Conclusions of Law, filed July 11, 2008).

Mr. Jordan was transferred from the ADX to other BOP facilities while his appeal was pending, we must address whether any portion of this case is moot. We conclude that Mr. Jordan's First Amendment facial and as-applied challenges are moot; thus, we need not consider whether the Ensign Amendment—insofar as it is implemented through 28 C.F.R. § 540.72—is unconstitutional.

## I.    Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to the adjudication of "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. Although the parties and the district court neglected to address whether Mr. Jordan had standing to challenge the constitutionality of the Ensign Amendment, we raise the issue *sua sponte* "[b]ecause it involves the court's power to entertain the suit." *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 792 (10th Cir. 2009) (quoting *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1222 (10th Cir. 2005)) (internal quotation marks omitted), *cert. denied*, 130 S. Ct. 1687 (2010). "Standing is determined as of the time the action is brought." *Utah Ass'n of Counties v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006) (alteration omitted) (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005)) (internal quotation marks omitted); *see Mink v. Suthers*, 482 F.3d 1244, 1253–54 (10th Cir. 2007) ("[S]tanding is determined at the time the action is brought, and we generally look to when the complaint was first filed, not to subsequent events." (citation omitted)); *see also Utah Animal Rights Coal. v. Salt*

*Lake City Corp.*, 371 F.3d 1248, 1263 (10th Cir. 2004) ("Standing doctrine addresses whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court.").  To establish Article III standing, the plaintiff bears the burden of demonstrating the following three elements:  (1) an injury in fact; (2) a causal connection between the injury and the challenged action; and (3) a likelihood that a favorable decision will redress the injury.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000).

The injury-in-fact element requires "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted) (internal quotation marks omitted).  Although a plaintiff may present evidence of a past injury to establish standing for retrospective relief, he must demonstrate a continuing injury to establish standing for prospective relief.  *PETA v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002).  "[A] plaintiff who challenges a statute on First Amendment grounds may satisfy the injury-in-fact requirement 'by showing a credible threat of prosecution or other consequences following from the statute's enforcement.'"  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1182 (10th Cir. 2010) (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)); *see also Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 192 (3d Cir. 1990) ("[T]he plaintiff

must demonstrate that the probability of that future event occurring is real and substantial, 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 460 (1974))).

We evaluate the constitutionality of a statute by assessing the manner in which it is implemented and enforced by the governmental officials who administer it. *See, e.g.*, *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."); *see also Bronson v. Swensen*, 500 F.3d 1099, 1108 (10th Cir. 2007) ("[T]he affirmative assurances of non-prosecution from a governmental actor responsible for enforcing the challenged statute prevents a 'threat' of prosecution from maturing into a 'credible' one."); *Salvation Army*, 919 F.2d at 192 ("[T]he current record reflects not only the absence of a threat of enforcement but an express assurance that there will be no enforcement . . . of the waived portions of the statute."). Thus, we consider the Ensign Amendment only as it is actually interpreted and applied by the BOP.

In so doing, we conclude that Mr. Jordan has standing to challenge the Ensign Amendment only to the extent that it is embodied in the BOP's narrowly drafted implementing regulation. The record reveals that the BOP never applies the Ensign Amendment directly to incoming publications; to the contrary, a BOP

-11-

official agreed at trial that prison staff apply a narrower interpretation of the statute through the implementing regulation and, secondarily, through the program statement, which establishes procedures to implement the prescriptions and restrictions of the regulation. The parties also stipulated that the BOP had rejected the publications at issue pursuant to 28 C.F.R. § 540.72 and the program statement and, throughout the administrative appeals process, the BOP issued several documents in which it confirmed that it had denied Mr. Jordan's individual publications under its own regulatory scheme. Although some of these appellate documents reference the Ensign Amendment, the BOP generally denied Mr. Jordan's appeals because it found that the rejection of the contested publications was consistent with its program statement, which effectuates the BOP's regulation.

Because BOP officials apply the Ensign Amendment *through* that implementing regulation and program statement, Mr. Jordan has not suffered an injury in fact with respect to the portions of the Ensign Amendment that fall outside the scope of the implementing regulation.[10] *See Amatel v. Reno*, 156 F.3d 192, 195 (D.C. Cir. 1998) (limiting the court's focus of the appeal to the Ensign

---

[10]    The Ensign Amendment covers certain materials that are exempt from the implementing regulation. For example, the Ensign Amendment (1) bans non-pictorial material that is sexually explicit or features nudity; and (2) contains no exception for "[p]ublications containing nudity illustrative of medical, educational, or anthropological content." *Compare* 28 U.S.C. § 530C(b)(6), *with* 28 C.F.R. § 540.72(b)(3)–(4).

Amendment's implementing regulation). Mr. Jordan has also not shown a "credible threat" that the BOP will apply the full scope of the Ensign Amendment to incoming publications in the future. *See Brammer-Hoelter*, 602 F.3d at 1182. We therefore "decline to provide an advisory opinion regarding the constitutionality" of the portions of the Ensign Amendment that are not embodied by the implementing regulation. *Salvation Army*, 919 F.2d at 193.

## II. Mootness

### A. Factual Background

In reviewing documents in another case before this court, *Jordan v. Wiley*, No. 09-1355, the panel learned that Mr. Jordan may have been transferred from the ADX to another BOP facility. Taking judicial notice of this development, the panel issued a show-cause order that directed both parties to file supplemental briefs addressing: "(1) Mr. Jordan's current location and conditions of confinement (e.g., prison facility and solitary-confinement status, if any); and (2) if Mr. Jordan is no longer housed in solitary confinement at ADX in Florence, Colorado, whether consequently this appeal is now moot, in whole or in part." Order at 2, filed Nov. 26, 2010.[11]

---

[11]    The parties' failure to inform the court of this significant development is inexplicable and inexcusable. It is the parties, not the court, who are positioned to remain abreast of external factors that may impact their case; this is of particular importance where, as here, those factors directly pertain to
(continued...)

The parties' simultaneous filings confirmed that Mr. Jordan had been transferred, but they reflected a puzzling disagreement concerning his new location. Mr. Jordan, through representations of his counsel and in his own affidavit, indicated that he was incarcerated in a federal penitentiary in Lee, Virginia. The government, through representations of counsel and an affidavit of a BOP official, initially indicated that he was being held at a federal penitentiary in Lee, *Pennsylvania*. Our review of the parties' briefs (with attachments) and the record in the related case, *Jordan v. Wiley*, indicated (perhaps not surprisingly) that Mr. Jordan knew where he was—the United States Penitentiary in Lee County, Virginia.[12]

Though the parties disputed Mr. Jordan's precise geographic location, they agreed that he was being held in administrative detention in a Special Housing

---

[11](...continued)
this court's substantive inquiry. We look to the parties to inform us of such developments, and we should be assured that they will do so diligently. Their failure to do so in this case has resulted in the expenditure of significant judicial resources on issues that, in light of the current procedural posture of this case, are irrelevant.

[12]     The Administrative Detention Order designating Mr. Jordan for placement in a Special Housing Unit listed the institution to which Mr. Jordan was to be transferred as "USP Lee, VA." Aplee. Supplemental Br., App., Decl. of Clay C. Cook [hereinafter "Cook Decl."], Attach. 3 (Administrative Detention Order, dated July 10, 2010). Presumably, the "VA" refers to the State of Virginia. Additionally, in *Jordan v. Wiley*, Mr. Jordan submitted a notice of change of address and a document seeking to supplement the record, both of which indicated that he had been relocated to a penal facility in Lee County, Virginia.

Unit ("SHU") at the time that they submitted their supplemental filings.[13]  They

also agreed that Mr. Jordan had been recommended for placement in a Special

Management Unit ("SMU").  A subsequent filing by the government in February

2011 confirmed that a BOP Regional Director had approved Mr. Jordan's transfer

to a SMU on account of his "propensity for violence and continued disruptive

behavior."  Aplee. Status Report at 1, filed Feb. 14, 2011.  It further indicated

that Mr. Jordan would therefore be transferred to a SMU "in the foreseeable

future."  *Id.* at 2.  According to the government, the BOP's SMU facilities are

located in Lewisburg, Pennsylvania; Talladega, Alabama; and Oakdale, Louisiana.

---

[13]      SHU inmates are generally subject to the same conditions of
confinement, and afforded the same privileges, as inmates housed within the
general population.  *See* 28 C.F.R. § 541.22(d) ("If consistent with available
resources and the security needs of the unit, the Warden shall give an inmate
housed in administrative detention the same general privileges given to inmates in
the general population.").  Accordingly, SHU inmates may be housed with other
inmates, and Mr. Jordan's counsel represented that he had a cell mate throughout
his term of incarceration at the SHU facility.  *See* Aplt. Supplemental Br. at 14.
As a SHU inmate, Mr. Jordan also retained the right to possess reasonable
amounts of personal property including magazines, books, and other commercial
publications, as well as the right to receive mail.  The government concedes that
the Ensign Amendment and its implementing regulation apply with full force to
prisoners held in SHU administrative detention, and Clay Cook, a Senior Attorney
Advisor at the BOP, stated in a sworn declaration that Mr. Jordan was unlikely to
receive the commercial publications at issue in this case in light of the
Amendment.  *See* Cook Decl. at 12.  Mr. Jordan himself has declared, under
penalty of perjury, that his "conditions of confinement ha[d] not materially
changed" at the time that he was being held in a SHU; thus, he "remain[ed]
subject to the Ensign Amendment and the published [f]ederal regulations
governing incoming publications and correspondence."  Aplt. Supplemental Br.,
Ex. 1, at 4 (Decl. of Mark Jordan, at 4) [hereinafter "Jordan Decl."].

-15-

Aplee. Supplemental Br. at 4. None of these facilities are within the jurisdiction of this court.

Our review of the BOP's online Inmate Locator indicates that an inmate matching Mr. Jordan's basic physical description (i.e., gender and race) *and* possessing the BOP registration number associated with Mr. Jordan in this case is currently being held at a SMU facility in Lewisburg, Pennsylvania. Given that the parties have not informed us of any deviation from the BOP's plan to place Mr. Jordan in a SMU, we are content to proceed on the premise that he is currently housed in a SMU facility and almost certainly the one located in Lewisburg, Pennsylvania.

Inmates housed within a SMU, like those housed within a SHU, are not necessarily held in solitary confinement. *See* Cook Decl., Attach. 4, at 5 (Special Management Units Program Statement, dated Nov. 19, 2008) ("Living quarters ordinarily house only the number of occupants for which they are designed. The Warden, however, may authorize additional occupants as long as adequate standards can be maintained."); *id.* at 7 ("The Associate Warden is responsible for determining which inmates may be housed or participate in activities together, as necessary to protect the safety, security, and good order of the institution."). However, the "[c]onditions of confinement for SMU inmates [are] more restrictive than for general population inmates." *Id.* at 5. The SMU program

consists of four progressive levels, differentiated by the degree of inmate interaction allowed, the amount of personal property that inmates are permitted to possess, and the programming that inmates must complete. *Id.* at 7–10; *see also* Cook Decl. at 6. Inmates are expected to complete the SMU program within eighteen to twenty-four months. *See* Cook Decl., Attach. 4, at 1. The government concedes that SMU inmates remain subject to the Ensign Amendment and its implementing regulation, and a senior BOP official represented that the Amendment is likely to foreclose Mr. Jordan's access to the requested publications while he remains in the SMU program. *See* Cook Decl. at 12. Mr. Jordan himself represents that "[f]or so long as [he] remains in the BOP, the Ensign Amendment and the [applicable] mail regulations, and implementing [p]rogram [s]tatements, will continue to apply to [his] receipt of correspondence and publications." Jordan Decl. at 6.

We must emphasize that these descriptions are lacking in concreteness and specificity, recounting only the general conditions of confinement prescribed by the BOP's regulations and policy materials. Mr. Cook—the BOP official offering testimony via affidavit for the government—is based in Colorado, and he does not purport to have personal knowledge concerning Mr. Jordan's current conditions of confinement outside of Colorado. Moreover, as Mr. Cook noted, wardens of BOP institutions ordinarily promulgate institutional supplements that provide institution-specific guidance to subordinates tasked with implementing BOP

-17-

policy. Consequently, as relevant here, BOP facilities may differ in the manner in which they interpret and apply the Ensign Amendment through the BOP's implementing regulation, 28 C.F.R. § 540.72. Significantly, we do not have any judicial findings of fact regarding Mr. Jordan's current circumstances of confinement. In light of the foregoing, the details of Mr. Jordan's current conditions of confinement are not entirely clear. In other words, we are not able to gain from the record a completely accurate and comprehensive picture of those conditions.

### B. Constitutional and Prudential Mootness

Given Mr. Jordan's multiple facility transfers, we must consider whether any of Mr. Jordan's claims are now moot. Mr. Jordan insists that his case is not moot because, "[r]egardless of his current or final placement, [he] remains in the custody of the BOP and is therefore subject to the Ensign Amendment, all published federal regulations governing incoming publications and correspondence, and the [BOP's] . . . [p]rogram [s]tatements." Aplt. Supplemental Br. at 4. More specifically, he claims that "[b]ecause his challenge is to the statute and the regulation, rather than to the specific conditions of confinement at ADX, his transfer to a new institution does not operate to moot his claims." *Id.* The government acknowledges that the BOP enforces the Ensign Amendment and its implementing regulation in all of its facilities, including its

SMUs.  It is noteworthy that the government does not contend that Mr. Jordan's

First Amendment claims are *constitutionally* moot.  Rather, the government

argues that we should declare Mr. Jordan's claims to be *prudentially* moot due to

the changes in the location and circumstances of Mr. Jordan's penal housing.

"The mootness doctrine provides that although there may be an actual and

justiciable controversy at the time the litigation is commenced, once that

controversy ceases to exist, the federal court must dismiss the action for want of

jurisdiction."  15 James W. Moore & Martin H. Redish, *Moore's Federal Practice*

§101.90, at 101-237 (3d ed. 2010) (italicization omitted); *see United States v.*

*Juvenile Male*, 131 S. Ct. 2890, No. 09-940, 2011 WL 2518925, at *3 (June 27,

2011) (per curiam) ("It is a basic principle of Article III that a justiciable case or

controversy must remain 'extant at all stages of review, not merely at the time the

complaint is filed.'" (quoting *Arizonans for Official English v. Arizona*, 520 U.S.

43, 68 n.22 (1997))).  In other words, "[m]ootness is found when events outside

the litigation make relief impossible . . . .  Events may supersede the occasion for

relief, particularly when the requested relief is limited."  13C Charles A. Wright,

Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*

§ 3533.3.1, at 56, 59–60 (3d ed. 2008) (footnotes omitted).

The mootness doctrine relates to both "[t]he constitutional case or

controversy requirement of Article III . . . , as well as the prudential

considerations underlying justiciability."  15 Moore, *supra*, §101.90, at 101-237.

Accordingly, "[c]ourts recognize two kinds of mootness: constitutional mootness and prudential mootness." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1121 (10th Cir. 2010); *see also* Evan Tsen Lee, *Deconstitutionalizing Justiciability: The Example of Mootness*, 105 Harv. L. Rev. 605, 610 (1992) (observing that the mootness doctrine "has both constitutional and prudential components").[14] "Under the constitutional mootness doctrine, the suit must present a real and substantial controversy with respect to which relief may be fashioned. Also, the controversy must remain alive at the trial and appellate stages of the litigation." *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997) (citations omitted). Constitutional mootness is grounded in the requirement that "any case or dispute that is presented to a federal court be definite, concrete, and *amenable to specific relief*." 15 Moore, *supra*, §101.90, at 101-237 (emphasis added). Consequently, the constitutional mootness doctrine focuses upon whether "a definite controversy exists throughout the litigation and

---

[14]     As we noted in *Rio Grande Silvery Minnow*, a district court's constitutional and prudential mootness determinations are accorded different standards of review. "[W]e apply a de novo standard of review [where] the case presents a question of *constitutional* mootness." 601 F.3d at 1123 (emphasis added). In contrast, we ordinarily review a district court's *prudential* mootness determination for an abuse of discretion. *Id.* at 1122. In the present case, however, we necessarily undertake the mootness inquiry in the first instance as Mr. Jordan's multiple facility transfers occurred *after* the district court had completed its consideration of the merits of the case and had issued its Findings of Fact and Conclusions of Law on July 11, 2008. Consequently, we operate on a clean slate as to both our constitutional and prudential mootness analyses.

-20-

whether conclusive relief may still be conferred by the court despite the lapse of time and any change of circumstances that may have occurred since the commencement of the action." *Id.*

"Even if a case is not constitutionally moot, a court may dismiss [a] case under the prudential-mootness doctrine if the case 'is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the *power* to grant.'" *Rio Grande Silvery Minnow*, 601 F.3d at 1121 (quoting *Fletcher*, 116 F.3d at 1321). Prudential mootness therefore "addresses 'not the *power* to grant relief[,] but the court's *discretion* in the exercise of that power.'" *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (emphasis added) (quoting *Chamber of Commerce v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)). In general, the prudential mootness doctrine only applies where, as here, a plaintiff seeks injunctive or declaratory relief. *See Rio Grande Silvery Minnow*, 601 F.3d at 1122; *Bldg. & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993) ("All the cases in which the prudential mootness concept has been applied have involved a request for prospective equitable relief by declaratory judgment or injunction.").

Where a plaintiff requests equitable relief, a mere showing that he maintains a personal stake in the outcome of the controversy is insufficient. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). Rather, a plaintiff must

-21-

*additionally* demonstrate "an adequate basis for equitable relief"—that is, "[a] likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." *O'Shea v. Littleton*, 414 U.S. 488, 499, 502 (1974); *accord Randolph v. Rodgers*, 170 F.3d 850, 856 (8th Cir. 1999) ("A claim for equitable relief is moot 'absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again.'" (quoting *City of Los Angeles*, 461 U.S. at 111)); *see also* 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3533.1, at 730 (3d ed. 2008) ("Mootness decisions are concerned in large part with the determination whether any effective purpose can still be served by a *specific remedy*." (emphasis added)). Where a plaintiff seeks an injunction, his susceptibility to *continuing* injury is of particular importance—"[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 495–96.

Moreover, a plaintiff's continued susceptibility to injury must be reasonably certain; a court will not entertain a claim for injunctive relief where the allegations "take[] [it] into the area of speculation and conjecture." *Id.* at 497; *accord Rizzo v. Goode*, 423 U.S. 362, 372 (1976) (concluding that respondents' claim for injunctive relief was moot where their allegations of "real and immediate" injury were "even more attenuated than those allegations of

-22-

future injury found insufficient in *O'Shea* to warrant invocation of federal jurisdiction"). Similarly, in the context of an action for declaratory relief, a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant. *See Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (per curiam) (concluding that appellee's claim for declaratory relief was moot where his "primary claim of a present interest in the controversy is that he will obtain emotional satisfaction from a ruling that his son's death was wrongful"); *Green v. Branson*, 108 F.3d 1296, 1299 (10th Cir. 1997) ("This 'legal interest' [impacted by the litigation] must be more than simply the satisfaction of a declaration that a person was wronged." (quoting *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994))).

The mootness of a plaintiff's claim for *injunctive relief* is not necessarily dispositive regarding the mootness of his claim for a *declaratory judgment*. Where a plaintiff seeks both an injunction and declaratory relief, "the [d]istrict [c]ourt ha[s] '[a] duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of [an] injunction.'" *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 121 (1974) (quoting *Zwickler v. Koota*, 389 U.S. 241, 254 (1967)). "Declaratory judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit." *Rio Grande Silvery Minnow*, 601 F.3d at 1109. When we apply the mootness doctrine in the declaratory judgment context, "[i]t is well

-23-

established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of *the defendant toward the plaintiff*." *Id.* at 1109–10 (alteration in original) (emphasis added) (quoting *Cox*, 43 F.3d at 1348) (internal quotation marks omitted); *see also Camreta v. Greene*, 131 S. Ct. 2020, 2037 (2011) (Kennedy, J., dissenting) (reciting the "Article III prohibition against issuing advisory opinions"); *Herb v. Pitcairn*, 324 U.S. 117, 126 (1945) ("We are not permitted to render an advisory opinion . . . .").

Thus, where a plaintiff seeks a declaratory judgment against his opponent, he must assert a claim for relief that, if granted, would affect the behavior of the particular parties listed in his complaint. *See Rhodes v. Stewart*, 488 U.S. 1, 4 (1988) (per curiam) ("A declaratory judgment . . . is no different from any other judgment. It will constitute relief . . . if, and only if, it affects the behavior of *the defendant toward the plaintiff*." (emphasis added)); *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (same); *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) ("[A] federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of *litigants in the case before them*.'" (emphasis added) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam))); *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) ("[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having *adverse legal*

*interests*, of *sufficient immediacy* and reality to warrant the issuance of a declaratory judgment." (emphasis added)); *see also Rice*, 404 U.S. at 246 ("[F]ederal courts are without power to decide questions that cannot affect the rights of *litigants in the case before them*." (emphasis added)).

That a declaration might guide *third parties* (i.e., those not parties to the lawsuit) in their future interactions with a plaintiff is insufficient. "Under the [f]ederal Declaratory Judgment[] Act, Congress has authorized declaratory judgements only '[i]n . . . case[s] of actual controversy.'" *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir. 1993) (third and fourth alterations in original) (quoting 28 U.S.C. § 2201). Thus, "[t]he controversy must be 'real and substantial[,] . . . admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts.'" *Id.* (ellipsis in original) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)); *see Juvenile Male*, 2011 WL 2518925, at *3 ("True, a favorable decision in this case might serve as a useful precedent for respondent in a hypothetical lawsuit challenging Montana's registration requirement on *ex post facto* grounds. But this possible, indirect benefit in a future lawsuit cannot save *this* case from mootness."). A declaratory judgment that merely seeks to affect the (uncertain) future conduct of third parties—who are not named in a plaintiff's complaint—would involve the very sort of speculative, "hypothetical" factual scenario that would render such a judgment a

-25-

prohibited advisory opinion.

Consequently, in a mootness inquiry in the declaratory judgment context, it is critically important to determine whether the plaintiff has named, as defendants, individuals or entities that are actually situated to have their future conduct toward the plaintiff altered by the court's declaration of rights. If the plaintiff has not named such individuals or entities, courts are likely to determine that they cannot accord the plaintiff effective declaratory relief and that the action is moot. *See id.*; Note, *Cases Moot on Appeal: A Limit on the Judicial Power*, 103 U. Pa. L. Rev. 772, 775 (1955) [hereinafter *Cases Moot on Appeal*] ("For obvious reasons, courts prefer not to enter decrees which will have no effect on the present status of the parties, and will dismiss such cases in order to devote their time to the decision of live controversies, which do give relief to those whose rights have been violated."); *cf. Pritikin v. Dep't of Energy*, 254 F.3d 791, 799–800 (9th Cir. 2001) (dismissing plaintiff's case for lack of standing where she sought "to change [a defendant's] behavior only as a means to alter the conduct of a *third party*, not before the court, who [was] the direct source of [her] injury" (emphasis added) (quoting *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983)) (internal quotation marks omitted));[15] *Chicago & N.*

_____

[15]     We rely in our mootness analysis to a limited extent on cases involving standing questions, recognizing that standing and mootness are "closely related doctrines." *Utah Animal Rights Coal.*, 371 F.3d at 1263; *see id.* (noting
(continued...)

*W. Transp. Co. v. Ry. Labor Execs.' Ass'n*, 908 F.2d 144, 149 (7th Cir. 1990)

("[A]n order that is not actually or at least potentially coercive[,] . . . including

. . . a declaratory judgment[,] does not impose the sort of tangible harm that

Article III requires for standing to seek judicial relief, including relief in the form

of an appellate judgment." Rather, "[i]t is just an advisory opinion" that may

"compel the dismissal of an appeal.").

## C.     Prisoner Transfers and Mootness

When a prisoner files suit against prison officials who work in the

institution in which he is incarcerated, seeking declaratory and injunctive relief

on the basis of alleged wrongful conduct by those officials, and then that prisoner

is subsequently transferred to another prison or released from the prison system,

courts are presented with a question of possible mootness. *See, e.g.*, *Green*, 108

F.3d at 1299 ("Since he has been transferred from state custody to federal custody

and has been released, Green concedes that his claim for injunctive relief against

state employees is moot."); *see also Muhammad v. City of New York Dept. of*

*Corr.*, 126 F.3d 119, 123 (2d Cir. 1997) (concluding that granting plaintiff's

claim "would afford no 'legally cognizable benefits' to [plaintiff], who is no

---

[15](...continued)
that "[t]he Supreme Court has described the doctrine of mootness as 'the doctrine of standing set in a time frame'" (quoting *Arizonans for Official English*, 520 U.S. at 68 n.22)); *Belles v. Schweiker*, 720 F.2d 509, 513 n.7 (8th Cir. 1983) ("The doctrines of standing and mootness are conceptually related.").

longer imprisoned within the [New York City Department of Corrections] system"). Where the prisoner's claims for declaratory or injunctive relief relate solely to the conditions of confinement at the penal institution at which the prisoner is no longer incarcerated, courts have concluded that they are unable to provide the prisoner with effective relief.[16] Because a prisoner's transfer or

---

[16] An analogous situation arises where a plaintiff sues a government official who is subsequently "divested of responsibility for the challenged conduct or activity during the pendency of the action." 15 Moore, *supra*, §101.94[3], 101-257. In that situation, as in the prisoner-transfer context, "mootness occurs either because the plaintiff is no longer exposed to harm by that particular defendant, or because the defendant can no longer comply with the remedy that may be ordered by the court." *Id.*; *see also Spomer v. Littleton*, 414 U.S. 514, 520–21 (1974) (remanding for a determination as to whether respondents' claims were moot where they sought equitable relief against the State's Attorney in his official capacity, and he had since been succeeded by petitioner, and respondents had failed to name petitioner as a defendant or "cite[] any conduct of [petitioner] as the basis for equitable or any other relief" in their complaint); *Nat'l Treasury Emps.' Union v. Campbell*, 654 F.2d 784, 788 (D.C. Cir. 1981) ("[W]here the conduct challenged is personal to the original named defendant, even though he was sued in his official capacity, a request for prospective injunctive relief is mooted when the defendant resigns."). In other words,

> in lawsuits against governmental officials based on specific actions taken during their tenure in office, when the relief sought is other than monetary damages, the potential of a mootness challenge exists because once the governmental officials no longer hold that position, the requisite adversity of interest between the parties, which must exist throughout the duration of the action, may be lost, and any remedy that might otherwise have been provided by the court would therefore serve no effective purpose.

15 Moore, *supra*, §101.94[3], at 101-257. The courts' treatment of this analogous situation is therefore instructive here.

release "signal[s] the end of the alleged deprivation of his constitutional rights," *McKinnon v. Talladega Cnty., Ala.*, 745 F.2d 1360, 1362 (11th Cir. 1984), an entry of equitable relief in his favor "would amount to nothing more than a declaration that he was wronged, and would have no effect on the defendants' behavior towards him." *Green*, 108 F.3d at 1300. Consequently, courts have routinely dismissed such penitentiary-specific conditions-of-confinement claims as moot. *See Sossamon v. Texas*, 131 S. Ct. 1651, 1669 (2011) ("A number of . . . suits seeking injunctive relief have been dismissed as moot because the plaintiff was transferred from the institution where the alleged violation took place prior to adjudication on the merits." ); *accord Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir.), *cert. denied*, 131 S. Ct. 469 (2010); *Green*, 108 F.3d at 1300; *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) ("[A] prisoner's claim for injunctive relief is moot if he or she is no longer subject to those conditions."); *see also Edwards v. Johnson*, 209 F.3d 772, 776 (5th Cir. 2000) (concluding that plaintiff's "claims for injunctive relief to correct procedures and practices at [the Federal Detention Center in Oakdale, Louisiana] facility [were] moot" because he had subsequently been transferred out of that facility).[17]

---

[17] Therefore, under our holdings in *Green* and *Abdulhaseeb*, where a prisoner is no longer housed at the penal institution having the conditions of confinement that form the basis of his suit, declaratory relief—as well as injunctive relief—is ordinarily not available. Yet, we would be remiss if we did not briefly mention our decision in *Love v. Summit County*, 776 F.2d 908 (10th

(continued...)

However, where a prisoner brings a lawsuit challenging policies that apply in a generally uniform fashion throughout a prison system, courts have been disinclined to conclude that the prisoner's declaratory or injunctive claims are moot, even after he has been transferred to another prison in that system. *See Abdulhaseeb*, 600 F.3d at 1311–12; *accord Randolph*, 170 F.3d at 856–57. Critically, in determining that the transferred prisoners' claims for declaratory or injunctive relief were not moot, these courts have focused upon the fact that the

_____

[17](...continued)
Cir. 1985), though we conclude upon examination that *Love* does not meaningfully inform our analysis and that its conceivably relevant snippets of text cannot reasonably be read as standing for a proposition contrary to the holdings of *Green* and *Abdulhaseeb*. In *Love*, a prisoner plaintiff had been transferred from the county jail that maintained the law-library policies forming the basis of his lawsuit. The prisoner "acknowledge[d] that his transfer . . . rendered his claim for injunctive relief moot," 776 F.2d at 910 n.4, and the county defendant did not assert that any other aspect of his case was moot. We concluded that the "only" issues we were obliged to "determine" were "whether plaintiff was entitled to damages *or declaratory relief* for injury to him in violation of his right of access to the courts." *Id.* at 912 (emphasis added). Conceivably, *Love* might be read to allow for the possibility that declaratory relief may be a constitutionally viable remedy in a conditions-of-confinement case, even where a prisoner is transferred from the penal institution where the conditions exist.

However, there is virtually no discussion of mootness in *Love*. In particular, the court did not expressly undertake a mootness analysis with respect to the claim for declaratory relief. Moreover, *Love* has never been cited by us for a proposition contrary to the holdings of *Green* and *Abdulhaseeb*. Consequently, we would be hard-pressed to conclude that *Love* is actually at odds with those cases; indeed, reaching such a conclusion from the snippets of conceivably relevant text in *Love* would be more an act of speculation than judicial explication. Thus, at bottom, *Love* does not meaningfully inform our analysis in this case. Instead, *Green* and *Abdulhaseeb* (among other cases) chart the path for our mootness analysis.

-30-

prisoners had sued defendants who were actually situated to effectuate any prospective relief that the courts might see fit to grant—*viz.*, that the prisoners had sued the director of the prison system or the prison system itself. *See Abdulhaseeb*, 600 F.3d at 1312 ("Even if Mr. Abdulhaseeb cannot recover money damages against any defendant or injunctive relief against the prison-specific defendants, the courts may still fashion some effective relief. The [Oklahoma Department of Corrections ("ODOC")] [d]efendants, particularly the director of ODOC, remain parties to the litigation."); *Randolph*, 170 F.3d at 857 (concluding that a transferred prisoner's claims were not moot where he "assert[ed] claims directly against the Missouri Department of Corrections[] . . . which controls both prisons and the funding necessary to provide the" relief that the plaintiff requested). Conversely, these cases indicate that a transferred prisoner's challenge to system-wide prison policies is moot where he seeks equitable relief and *only* sues prison officials at the transferor institution—that is, the institution where he was *formerly* incarcerated. *See Abdulhaseeb*, 600 F.3d at 1312. Consequently, federal prisoners seeking declaratory or injunctive relief frequently sue not only the individual prison officials, in their official capacity, who work at the particular facility at which they were housed at the time that the alleged unconstitutional conduct purportedly occurred, but also the BOP's Director in his official capacity, and sometimes the BOP itself. *See, e.g.*, *Yousef v. Reno*, 254 F.3d 1214 (10th Cir. 2001); *Prows v. Fed. Bureau of Prisons*, 981 F.2d 466 (10th

-31-

Cir. 1992); *see also Nelson v. Carlson*, 904 F.2d 560 (10th Cir. 1990) (per curiam).

### D.   Mootness of Mr. Jordan's Claims

Applying these principles to the present case, we conclude that Mr. Jordan's facial and as-applied First Amendment challenges are moot. Specifically, unlike the government, we conclude that Mr. Jordan's claims are *constitutionally* moot: we cannot accord him prospective relief that would have any effect in the real world. Moreover, even if we were to conclude that Mr. Jordan's challenges were not constitutionally moot, considerations of prudence and comity would lead us to stay our hand in resolving them on the merits. In other words, we would conclude that his claims are *prudentially* moot. We therefore dismiss Mr. Jordan's appeal.

### 1.   Constitutional Mootness

Mr. Jordan contends that injunctive and declaratory relief are effective remedies for his First Amendment claims because he does not challenge conditions of confinement that are "specific to the transferring institution," the ADX. Aplt. Supplemental Br. at 7. Rather, as Mr. Jordan reasons, his claims involve First Amendment challenges to the Ensign Amendment and its implementing regulation—both of which are applied throughout the BOP system in which he remains incarcerated. He therefore argues that his transfer to another BOP *facility*—at which the Ensign Amendment and implementing regulation

-32-

continue to apply—does not prevent this court from fashioning effective equitable relief. In other words, "because Mr. Jordan [allegedly] remains under the threat of irreparable injury—the very real threat that future publications will be rejected pursuant to the Ensign Amendment and 28 C.F.R. § 540.72," *id.*, he reasons that he maintains a justiciable interest in seeking a declaration that those legal pronouncements are unconstitutional under the First Amendment and enjoining their enforcement against him.

However, there is a critical flaw in Mr. Jordan's argument: he has never sought relief on a system-wide basis against the BOP in this case. Instead of suing the BOP or its director, he has pursued injunctive and declaratory relief only with respect to individual BOP officials at specific penal institutions—most notably, the Inmate Systems Manager and the Warden at the ADX in Florence, Colorado, where Mr. Jordan was incarcerated at the time that he commenced his lawsuit. Even a cursory examination of Mr. Jordan's litigation history reveals that he has not always taken this approach and that he knows how to seek system-wide relief.[18] But he did not do so here. Therefore, Mr. Jordan has not sued

_____

[18] Mr. Jordan has previously filed suit against the BOP Director and the BOP. For instance, in a 1997 lawsuit in the United States District Court for the District of New Jersey—identified in his complaint in this action—Mr. Jordan named Kathleen Hawk, then the Director of the BOP, as a defendant in an action seeking unspecified relief for an Eighth Amendment violation. *See* Aplt. App., Vol. I, at 25 (Compl., filed July 12, 2005). *See generally Shakur v. Hawk*, 528 U.S. 896 (1999) (denying a petition for a writ of certiorari in an action filed

(continued...)

-33-

defendants who are actually situated to effectuate any prospective relief that this court might afford him. *See Abdulhaseeb*, 600 F.3d at 1312; *Randolph*, 170 F.3d at 857; *cf. Pritikin*, 254 F.3d at 798 (concluding that, in an action against a federal governmental defendant, plaintiff lacked standing because she "sued the wrong party"). Thus, the situation here is actually somewhat akin to that in the conditions-of-confinement cases because Mr. Jordan is no longer housed in a penal institution where he could experience the benefits of any prospective relief ordered against the named defendants; those defendants perform their correctional duties in penal institutions where Mr. Jordan is not incarcerated.

Any prospective relief that we might order against the named defendants would be too abstract and lacking in real-world impact to satisfy the requirements of the Constitution. For example, if we issued an injunction ordering those named officials to cease applying the Ensign Amendment and its implementing regulation to any sexually explicit publications that Mr. Jordan may request in the future, such an injunction would have no "effect in the real world." *Abdulhaseeb*, 600 F.3d at 1311 (quoting *Kan. Judicial Review v. Stout*, 562 F.3d 1240, 1246

---

[18](...continued)
against "Kathleen Hawk, Director, Federal Bureau of Prisons"). In 1999, Mr. Jordan again filed suit—this time against the BOP itself—in the United States District Court for the District of Colorado, alleging violations of his Fifth and Eighth Amendment rights. *See* Aplt. App., Vol. I, at 43; *Jordan v. Fed. Bureau of Prisons*, Dist. Ct. No. 99-F-2386 (filed Dec. 14, 1999). Thus, had Mr. Jordan actually sought to sue the BOP or its director, he certainly knew how to do so.

(10th Cir. 2009)) (internal quotation marks omitted); *see also O'Shea*, 414 U.S. at 495–96. That is because those officials are not located in the same penal institution as Mr. Jordan and, consequently, they would not be responsible for actually issuing (or authorizing others to issue) sexually explicit publications to Mr. Jordan. As it relates to Mr. Jordan, enjoining them would accomplish nothing.

A similar problem would arise were we to issue a declaratory judgment proclaiming the Ensign Amendment and its implementing regulation unconstitutional. While a declaratory judgment opining that the Ensign Amendment and its implementing regulation violated the First Amendment could be directed toward the named officials, it would not affect the behavior of those officials *toward Mr. Jordan* because he is no longer housed in a penal institution over which they exert authority. Consequently, such "a declaratory judgment in [Mr. Jordan's] favor would amount to nothing more than a declaration that he was wronged, and would have no effect on the defendants' behavior towards him." *Green*, 108 F.3d at 1300. In other words, it would run afoul of the Supreme Court's proscription against advisory opinions. *See, e.g.*, *Camreta*, 131 S. Ct. at 2037–38; *Herb*, 324 U.S. at 126; *accord Rio Grande Silvery Minnow*, 601 F.3d at 1110–12; *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 412 (3d Cir. 1992) ("[E]ven if a declaratory judgment would clarify the parties' legal rights, it should ordinarily *not* be granted unless 'the parties' plans of actions are likely to

be affected by a declaratory judgment.'" (emphasis added) (quoting *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 649 (3d Cir. 1990))). And the mere fact that such a declaratory judgment *might* provide some unspecified guidance to *non-party* BOP officials in their future conduct toward Mr. Jordan is insufficient to render *this action* a live case or controversy within the meaning of the Constitution. *Cf. Pritikin*, 254 F.3d at 798*; Chicago & N. W. Transp. Co.*, 908 F.2d at 149.

In resisting a conclusion of mootness, Mr. Jordan suggests that although he has sued only certain subordinate BOP officials who operate at individual penal institutions, the fact that he has sued those officials in their *official* capacity requires us to construe his suit as effectively against the entity that they represent—the BOP. Thus, as Mr. Jordan argues, this court is situated to grant an injunction and declaratory judgment against the BOP in its entirety rather than against the individual defendants that he has named in his complaint. This argument, however, finds no support in this circuit's case law.

Mr. Jordan relies upon our decision in *Simmat v. United States Bureau of Prisons*, 413 F.3d 1225 (10th Cir. 2005), in which we held that an official-capacity suit against prison officials—below the rank of director—is effectively a suit against the United States. *See id.* at 1232 ("Although nominally brought against the prison dentists, Mr. Simmat's claim is in reality against the United States."); *see also* Aplt. Supplemental Br. at 8–9 (discussing *Simmat*). Mr.

-36-

Jordan's reading of *Simmat*, however, conflates a suit against the United States with a suit against the BOP. *Simmat* does not stand for the proposition that a suit against certain BOP subordinate officials is to be construed as one against the BOP or the BOP Director. Nor does it follow from *Simmat*'s holding that "an injunction in this matter would be granted against the BOP rather than against the individual ADX and FCI-Englewood defendants," Aplt. Supplemental Br. at 9, that Mr. Jordan has named in his complaint.

*Simmat* turned upon whether the district court had *statutory* subject matter jurisdiction to entertain a claim for, *inter alia*, injunctive relief against prison officials. Our attention, therefore, was neither upon the mootness doctrine generally nor upon the more specific question of whether the district court was situated to fashion effective prospective relief against the BOP in light of the identity of the named federal defendants. *Simmat*, 413 F.3d at 1240 ("The district court had subject matter jurisdiction in this case under 28 U.S.C. § 1331 or 1361. The cause of action arose directly under the Eighth Amendment, and relief against the prison dentists would take the form of a mandatory injunction or, more precisely, relief in the nature of mandamus."). Indeed, in *Simmat*, we recognized the distinction between claims against individual BOP dentists in their official capacities and claims against the BOP itself. In so doing, we found that Mr. Simmat had failed to exhaust the requisite administrative remedies for his claim against the named *BOP dentists* in their official capacity. *Id.* at 1238, 1240.

However, we *separately* concluded that Mr. Simmat had waived his Eighth Amendment claim against the *BOP* by failing to raise it in the district court. *Id.* at 1239–40.

Thus, the fact that Mr. Jordan's suit against individual subordinate BOP officials—most notably, those at the ADX—in their official capacities constitutes a suit against the *United States* for statutory subject-matter jurisdictional purposes does not necessarily mean that it constitutes a suit against the *BOP* for purposes of the mootness analysis at issue here. Indeed, *Simmat*'s reasoning—recognizing a distinction between suits against individual BOP officials and suits against the BOP itself—suggests to the contrary. Absent further supportive authority, we cannot endorse Mr. Jordan's position, and we decline to read *Simmat* in the manner that he proposes.

This rejection of Mr. Jordan's reasoning is critical to our mootness inquiry: it means that the nationwide conduct of the BOP in enforcing the Ensign Amendment and its implementing regulation cannot directly enter into our assessment of whether Mr. Jordan's facial and as-applied claims are moot. Instead, we must focus upon whether granting Mr. Jordan injunctive or declaratory relief against the named BOP defendants will have any effect in the real world, given that Mr. Jordan is no longer incarcerated at the ADX or any other BOP facility that the named BOP officials administer and, as discussed further below, there is no concrete prospect that Mr. Jordan will be returned to

any of those facilities in the foreseeable future.

As to the latter point, we reiterate that prisoners assigned to a SMU—as Mr. Jordan has been—remain in SMU housing for at least eighteen to twenty-four months. Moreover, the government represents that the "BOP has no plans in the foreseeable future to transfer Jordan to a BOP facility within the Tenth Circuit." Aplee. Supplemental Br. at 10. Though Mr. Jordan asserts to the contrary, his representation that "[t]here is . . . a reasonable *possibility* that Mr. Jordan will be returned to the ADX in Florence, Colorado" is entirely speculative and based upon faulty premises. Aplt. Supplemental Br. at 14 (emphasis added).

It should go without saying that we are disinclined to opine on important constitutional issues based upon the speculative suggestion that a plaintiff *might* be returned to a setting where he would be subject to allegedly unconstitutional practices. *See Preiser*, 422 U.S. at 403 ("Any subjective fear [respondent inmate] might entertain of being again transferred . . . is indeed remote and speculative . . . ."); *Armstrong World Indus., Inc.*, 961 F.2d at 411–12 ("Where the plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III."); *see also Armstrong World Indus., Inc.*, 961 F.2d at 412 ("[T]o protect against a feared future event, the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory

-39-

judgment." (quoting *Salvation Army*, 919 F.2d at 192) (internal quotation marks

omitted)); *cf. Pac. Gas and Elec. Co. v. State Energy Res. Conservation & Dev.

Comm'n*, 461 U.S. 190, 201 (1983) ("If the injury is *certainly impending*, that is

enough." (emphasis added) (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419

U.S. 102, 143 (1974)) (internal quotation marks omitted)); *Columbian Fin. Corp.

v. BancInsure, Inc.*, — F.3d —, 2011 WL 2450969, at \*11 (10th Cir. June 21,

2011) (noting that "the *sine qua non* [for consideration of a declaratory judgment

action] is an identifiable specific claim that has risen above the horizon"); *Beshaw

v. Fenton*, 635 F.2d 239, 242 (3d Cir. 1980) ("[T]here is in the present situation a

*distinct* possibility that Beshaw will once again suffer the 'wrong' of which he

complains, namely, transfer to a federal facility.  Counsel for the government

stated at oral argument that Beshaw *would likely be moved* to a federal institution

if a position at a suitable facility became available.  In light of these

circumstances, we find that Beshaw's claim is still alive and that his appeal is not

moot." (emphasis added)).

Indeed, the only evidence that Mr. Jordan offers in support of his assertion

that he may be returned to the ADX actually undercuts his position.  Mr. Jordan

avers that "if the [BOP's Designation and Sentence Computation Center]

*disapproves* the SMU referral[,] [he] will then be considered for return to the

ADX in Florence, Colorado."  Jordan Decl. at 3 (emphasis added).  Of course, the

SMU referral was actually *approved* for Mr. Jordan; thus, the factual predicate for

-40-

his (already speculative) belief that he might be returned to the ADX in Colorado has not materialized.

In sum, we must center our mootness analysis upon the individual BOP officials that Mr. Jordan has identified as defendants, remaining mindful of the fact that Mr. Jordan is no longer subject to their authority. With that focus, we are hard-pressed to conclude that we may grant Mr. Jordan injunctive or declaratory relief that would have any effect in the real world. *See McAlpine v. Thompson*, 187 F.3d 1213, 1217 n.5 (10th Cir. 1999) ("[S]ince McAlpine is no longer incarcerated at El Reno, no order from this court could presently provide McAlpine with the relief sought, i.e., an order enjoining Warden Thompson to provide McAlpine with peyote and other ceremonial items. Warden Thompson presently has no custody over McAlpine."). As such, we conclude that both his facial and as-applied challenges to the Ensign Amendment, as it is embodied in the BOP's implementing regulation, are constitutionally moot.

### 2.    Prudential Mootness

Even if we were to conclude that Mr. Jordan's claims could survive our constitutional-mootness inquiry, we would bar those claims on prudential-mootness grounds. First, if we were to issue an injunction or declaratory judgment to Mr. Jordan, we would be doing so without the benefit of specific, concrete information concerning his current conditions of confinement. In

particular, we operate without the benefit of a district court's findings of fact.[19]

The affidavit that the government submitted regarding the conditions of

confinement at SMU facilities is a poor substitute. The affiant is a BOP official,

stationed in Florence, Colorado, who does not purport to have any personal

knowledge concerning Mr. Jordan's current conditions of confinement. *See* Cook

Decl. at 1. Indeed, the BOP affiant was apparently unaware that Mr. Jordan had

been incarcerated in a SHU facility in Lee, *Virginia. See id.* at 2 (noting his

belief that Mr. Jordan is "currently confined at [USP] Lee, *Pennsylvania*"

(emphasis added)).

    Mr. Jordan's as-applied arguments highlight the problems created by the

---

[19] Although the government has raised the possibility of a remand to the district court for a resolution in the first instance of the mootness question, we decline that invitation and, more specifically, reject the notion of remanding to the district court to conduct factfinding regarding Mr. Jordan's current conditions of confinement. Our conclusion regarding constitutional mootness primarily turns on a *legal* assessment of the mootness implications of Mr. Jordan's designation of defendants, in view of his transfer from the ADX. Moreover, although the availability of judicial factfinding concerning Mr. Jordan's current conditions of confinement would aid our prudential-mootness analysis, considerations of prudence disincline us to remand this case. This litigation has been ongoing for almost six years and involved the expenditure of significant judicial resources. We do not see the wisdom of starting down a path that would invariably result in the passage of a considerable amount of time and the consumption of a good deal more judicial resources, especially when the prospects of fashioning effective prospective relief are so uncertain. Mr. Jordan is apparently not entirely unsympathetic to this reasoning. *See* Aplt. Supplemental Reply Br. at 7 ("[C]onsidering the fact that this litigation has been pending since 2005, it would seem a waste of judicial resources to delay a decision any further unless necessary to do so.").

dearth of information regarding his current conditions of confinement. Mr. Jordan contends that his possession of the banned materials would have no impact upon his fellow inmates because he "has no contact with other prisoners and is under tight supervision from guards at all times." Aplt. Opening Br. at 39. This argument, however, pertains entirely to Mr. Jordan's *solitary-confinement* status at the *ADX*. As discussed above, the regulatory provisions governing SMU housing suggest that it is unlikely that Mr. Jordan will be segregated from other inmates in his *current* housing circumstances. Indeed, as an inmate progresses through the SMU program, he is allowed greater contact with fellow inmates. *See, e.g.*, Cook Decl., Attach. 4, at 7–10. Thus, a critical factual predicate for Mr. Jordan's as-applied argument—i.e., solitary confinement—no longer applies to his current penal placement, and any prospective relief that we might fashion with respect to the named BOP defendant officials would not fully take into account Mr. Jordan's current confinement circumstances.

Furthermore, to the extent that Mr. Jordan's requested prospective relief could be said to have any effect in the real world, it would be only with respect to *non-party* BOP officials *outside* of this circuit. Even assuming, *arguendo*, that such an attenuated effect could permit us to conclude that this action was constitutionally viable, considerations of prudence and comity would lead us to stay our hand in according such relief. We have rejected the notion that "we [a]re bound by opinions handed down in other circuits," *Hill v. Kan. Gas Serv. Co.*,

-43-

323 F.3d 858, 869 (10th Cir. 2003), and any prospective relief that we might accord to Mr. Jordan—if it operates as Mr. Jordan would have it—would seek to bind non-party, extra-circuit BOP officials in the very manner that our case law discourages. We are disinclined to go down this path. Conceivably, these officials could be subject to conflicting advisements regarding the treatment of Mr. Jordan, on the one hand, and similarly situated inmates, on the other, if our First Amendment determinations diverged from those of a sister circuit where Mr. Jordan is housed. *Cf. Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) ("The broad scope of the injunction has the effect of precluding other circuits from ruling on the constitutionality of 11 C.F.R. § 100.22(b). Such a result conflicts with the principle that a federal court of appeals's decision is only binding within its circuit.").

We therefore conclude that even if Mr. Jordan's First Amendment facial and as-applied challenges were not constitutionally moot, considerations of comity and prudence would lead us to stay our hand and decline to reach the merits of his claims. That is, those considerations would lead us to conclude that Mr. Jordan's claims are prudentially moot.

### 3. Capable of Repetition Yet Evading Review

Alternatively, Mr. Jordan contends that, even if his as-applied claims would otherwise be moot, they are saved from a determination of mootness "because they are capable of repetition yet evade review." Aplt. Supplemental Br. at 12;

-44-

*see Rex v. Owens ex rel. State of Oklahoma*, 585 F.2d 432, 434 (10th Cir. 1978) (explaining that the capable-of-repetition exception is a "special circumstance[] whereby an action will not be dismissed as moot even though the party seeking relief is no longer affected by the action complained of"); *see also Turner v. Rogers*, __ S. Ct. __, No. 10-10, 2011 WL 2437010, at *6 (June 20, 2011) ("[T]his case is not moot because it falls within a special category of disputes that are 'capable of repetition' while 'evading review.'" (quoting *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911))). The "capable-of-repetition exception to the mootness doctrine," however, is a "narrow" one. *McAlpine*, 187 F.3d at 1216; *see United States v. Seminole Nation*, 321 F.3d 939, 943 (10th Cir. 2002) (addressing "the narrow exception to the mootness doctrine for conduct capable of repetition, yet evading review"). Consequently, "[t]his exception 'is only to be used in exceptional situations.'" *Chihuahuan Grasslands Alliance v. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008) (quoting *White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996)). Thus, outside of the class-action context, the

> doctrine [has been] limited to the situation where two elements combine[]: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.

*Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam). Mr. Jordan bears the burden of establishing *both* elements of this two-prong test. *See Libertarian*

-45-

*Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir.) ( "[P]laintiffs[] bear the burden

of proving both prongs."), *cert. denied*, 130 S. Ct. 3388 (2010); *Lawrence v.*

*Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005) ("The party asserting that this

exception applies bears the burden of establishing both prongs.").[20]  We

---

[20]     We note at the outset that Mr. Jordan's capable-of-repetition argument may be misguided.  By its terms, and in the manner that it is typically applied, the "duration" element of the exception's two-prong test pertains to the duration of the *governmental entity*'s alleged infringement on a plaintiff's rights, not upon external circumstances pertaining to the *plaintiff* that may shorten the duration of his exposure to the otherwise ongoing governmental action.  *See, e.g.*, *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 187 (1979) (observing that the first element of the test was met where the Chicago Board of Election Commissioners required new parties and independent candidates to obtain more signatures to appear on the ballot in city elections than in statewide elections where the Chicago Board's "conduct" in enforcing that requirement necessarily ceased after a local election was held); *S.E.C. v. Sloan*, 436 U.S. 103, 109 (1978) (concluding "[t]hat the first prong of [the] test [was] satisfied" where the challenged Security and Exchange Commission suspension orders, which suspended trade in the common stock of a corporation, "[would] last no more than 20 days, making effective judicial review impossible during the life of the orders"); *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) ("Regarding the first prong of the exception, neither party disputes that the challenged action"—the state's decision to enforce a Utah statute which excluded voters from voting in a November 2007 election to reduce the size of their school district—"was too short in duration to be fully litigated before its conclusion."); *Doe v. Sullivan*, 938 F.2d 1370, 1376 (D.C. Cir. 1991) (finding that the capable-of-repetition test was "securely satisfied" where the allegedly wrongful action—the Federal Drug Administration's grant of consent orders that allowed nerve gas treatment to be used on servicemen—"w[as] withdrawn within three months"); *Rex*, 585 F.2d at 435 (concluding that plaintiff's "case fit[] within the . . . two-pronged [capable-of-repetition] test" where (1) the State of Oklahoma terminated his commitment to and involuntary detention in the state hospital prior to the order of dismissal of his case, and (2) "it appear[ed] highly probable that [plaintiff] w[ould] again be subjected to the processes of the Oklahoma commitment statute"); *see also Ruiz v. Johnson*, 178 F.3d 385, 390 (5th Cir.
(continued...)

conclude that Mr. Jordan has not carried his burden regarding the first element

(i.e., the duration element), and we need not go further.

Referencing the BOP's initial rejection of certain publications in 2003 and

2004, Mr. Jordan contends that "[i]n the seven years that have elapsed during the

course of this litigation, it is reasonable to expect that Mr. Jordan's placement or

conditions of confinement would change at some point in that span of time."

Aplt. Supplemental Br. at 13. Thus, he appears to reason that if we were to

---

[20](...continued)
1999) ("Both the prison officials and the government seem to agree that the action at issue here—the district court's refusal to apply the automatic stay provision—is in its duration too short to be fully litigated prior to its cessation or expiration."), *abrogated on other grounds by Miller v. French*, 530 U.S. 327 (2000); *United States v. City of Detroit*, 720 F.2d 443, 449 (6th Cir. 1983) (holding that a district court order which effectively allowed the Administrator of the Environmental Protection Agency to deprive plaintiff of funds for its project within fourteen days constituted "time constraints . . . [that] were too short even when, as here, review was diligently pursued"). *But cf. Roe v. Wade*, 410 U.S. 113, 125 (1973) (concluding that "[p]regnancy"—as opposed to some allegedly unconstitutional governmental conduct—"provides a classic justification for a conclusion of nonmootness. It truly could be 'capable of repetition, yet evading review.'" (quoting *S. Pac. Terminal Co.*, 219 U.S. at 515)).

Mr. Jordan's argument, however, is premised upon the fact that his subsequent facility transfers purportedly shortened the term of his exposure to the Colorado ADX's application of the Ensign Amendment and its implementing regulation. Because this argument pertains to Mr. Jordan's change in circumstances rather than to the duration of the allegedly unconstitutional actions of the ADX officials named in Mr. Jordan's complaint, it does not seem to comport with the vast majority of the case law in which the capable-of-repetition exception has been applied. Ultimately, however, we need not definitively opine on this subject. As discussed *infra*, even as Mr. Jordan has framed it, his capable-of-repetition argument fails.

-47-

conclude that these types of First Amendment challenges are rendered moot by changes in prison placement or conditions of confinement over the course of several years, claims such as his would consistently evade review. However, contrary to the kind of duration evidence proffered by plaintiffs in prior cases, *see, e.g.*, *Napier v. Gertrude*, 542 F.2d 825, 828 (10th Cir. 1976) (explaining that the appellant, a child petitioner seeking release from her placement in a residence for girls, had "cite[d] statistics compiled by the State of Oklahoma showing the average length of detention for children adjudicated 'in need of supervision'" in an effort to meet the duration element of the two-prong exception), Mr. Jordan offers us nothing to validate the reasonableness of his expectancy of changed conditions of penal confinement. In other words, Mr. Jordan provides absolutely no evidence from which we might infer that this sort of allegedly unconstitutional behavior is *necessarily* of short duration—e.g., that an inmate is likely to be moved from the institution where he is subject to the allegedly unconstitutional action *before* he is able to litigate his claim. *Cf. Turner*, 2011 WL 2437010, at *4, *7 (where state statute authorized imprisonment of certain parents *"not for more than one year"* for civil contempt for failure to pay outstanding child support, holding that the capable-of-repetition exception applied because "[o]ur precedent makes clear that the 'challenged action,' [petitioner's] imprisonment for up to 12 months, is 'in its duration too short to be fully litigated' through the state courts (and arrive here) prior to its 'expiration.'" (emphasis added) (quoting

-48-

*First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 774 (1978))); *Seminole*

*Nation*, 321 F.3d at 943 (concluding that the National Indian Gaming Commission

Chairman's "temporary closure orders" were of "a sufficiently limited duration to

ordinarily escape appellate review," where the statute provided *in every instance*

for their dissolution or conversion to permanent status within ninety days);

*Finburg v. Sullivan*, 634 F.2d 50, 55 (3d Cir. 1980) ("[The plaintiff] must show

that the activity is 'by its very nature' short in duration, 'so that it could not, or

probably would not, be able to be adjudicated while fully "live."'" (quoting *Dow*

*Chemical Co. v. EPA*, 605 F.2d 673, 678 n.12 (3d Cir. 1979))).  In the absence of

such evidence, Mr. Jordan cannot meet the first prong of the two-prong capable-

of-repetition test, and we cannot except his claim from a mootness determination

on this ground.

### 4.    Voluntary Cessation

Finally, Mr. Jordan contends that "[t]he doctrine of voluntary cessation also

counsels against a finding of mootness" with regard to his as-applied claims.

Aplt. Supplemental Br. at 15.  As we recently explained:

> One exception to a claim of mootness is a defendant's voluntary
> cessation of an alleged illegal practice which the defendant is
> free to resume at any time.  The rule that voluntary cessation of
> a challenged practice rarely moots a federal case . . . traces to the
> principle that a party should not be able to evade judicial review,
> or to defeat a judgment, by temporarily altering questionable
> behavior.  In other words, this exception exists to counteract the
> possibility of a defendant ceasing illegal action long enough to

render a lawsuit moot and then resuming the illegal conduct.

*Rio Grande Silvery Minnow*, 601 F.3d at 1115 (citations omitted) (internal quotation marks omitted); *accord Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) ("Voluntary cessation does not moot a case or controversy unless 'subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (alteration omitted) (quoting *Friends of the Earth*, 528 U.S. at 189)). "Voluntary cessation of offensive conduct will only moot litigation if it is *clear* that the defendant has not changed course simply to deprive the court of jurisdiction." *Rio Grande Silvery Minnow*, 601 F.3d at 1115 (alteration omitted) (emphasis added) (quoting *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005) (per curiam)) (internal quotation marks omitted); *see also Cases Moot on Appeal*, *supra*, at 785 (noting that "where the cause of the cessation was *obviously unrelated* to the litigation, the cases have been dismissed" on mootness grounds (emphasis added) (footnote omitted)).

Mr. Jordan has not cited to one case in which the voluntary-cessation doctrine has been applied to facts such as these—where the defendants' allegedly unconstitutional conduct actually has not ceased but plaintiff has been (involuntarily) removed from the ambit of that conduct. Therefore, Mr. Jordan has done little to aid his cause. Furthermore, the most apposite case that we are

aware of works against him.  In *McKinnon*, the Eleventh Circuit rejected a prisoner's argument, predicated on the voluntary-cessation doctrine, that "the [prison official] defendants should not be permitted unilateral determination over the mootness of his case" because "he should not be penalized with dismissal" where "he had no control over his transfer."  *McKinnon*, 745 F.2d at 1363.  In rejecting this argument, the Eleventh Circuit noted that there was no evidence that the defendants engaged in "subterfuge" or sought "to evade the jurisdiction of the court."  *Id.*  We similarly are presented with no evidence that the BOP officials' transfer decisions were in any way a subterfuge.  To the contrary, it is patent and beyond peradventure that the BOP defendants did not transfer Mr. Jordan from the ADX in an effort to escape our jurisdiction.  Indeed, the named defendants neither brought Mr. Jordan's transfer to our attention nor sought a declaration of mootness on that basis prior to our *sua sponte* inquiry into his housing circumstances.  But for that affirmative inquiry, it is virtually certain that the BOP would never have informed us of Mr. Jordan's transfer.  Consequently, we easily conclude that Mr. Jordan's voluntary-cessation argument is without merit.

### III.  CONCLUSION

For the foregoing reasons, we conclude that Mr. Jordan's First Amendment claims are moot.  We therefore **DISMISS** Mr. Jordan's appeal.